UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

FORTRESS IRON L.P.,                              )
                                                 )
                      *Plaintiff*                )        Cause No. 3:21-cv-14-RLM-MGG
                                                 )
          v.                                     )
                                                 )
DIGGER SPECIALTIES, INC.,                        )
                                                 )
                      *Defendant*                )

<u>OPINION AND ORDER</u>

Fortress Iron L.P. brings this suit against Digger Specialties, Inc. for infringement of two separate but related patents. The parties identified five claim terms from the patents for construction, submitted their joint claim construction statement, and jointly moved for a hearing on their proposed constructions. The court held a claim construction hearing on July 11.

I. Background

Fortress designs and manufactures building products used in outdoor construction. One of Fortress's products is the FortressCable V-Series steel cable railing, which is a railing assemblage that is installed in places like the edge of a balcony or patio. Figure 1 below shows the general composition of the V-Series.



FIG. 1

The V-Series is built by first installing support posts (18) around the perimeter of an area and then attaching railing panels (10) to the support posts. The railing panels are comprised of a top rail (14) and bottom rail (12) that run horizontally between the support posts. The center of a railing panel is made of a few vertical supports (16) that maintain spacing between the top and bottom rails, and several steel cables (19) that are vertically pulled taut between the top and bottom rails to fill in the space between the vertical supports. Fortress obtained patent protection for the V-Series—U.S. Patent No. 10,883,290 (the "'290 Patent").

Figure 1 is part of the '290 Patent drawings. The '290 Patent was issued in January 2021 and claims priority to another Fortress patent—U.S. Patent No. 9,790,707 (the "'707 Patent"), which was issued in October 2017 (filed in April 2015) and protects the V-Series as well. The '290 Patent amends the '707 Patent's claims to add structural detail to how the bottom of the steel cables connect to the bottom rail. Figure 6B below (from the '290 Patent drawings) shows the general composition of this connection.



FIG. 6B

The bottom end of the steel cable (40) is threaded through a hole in the bottom rail (12) and then attached to a swage fitting (52). The swage fitting is then threaded through a U-shaped bracket (20) that is located within the bottom rail and secured by a nut (58).

Digger also produces building products used in outdoor construction and is a competitor of Fortress. Digger makes the Westbury Verticable aluminum railing. In January 2018, Fortress accused the Westbury Verticable of infringing the '707 Patent. Digger discontinued the Westbury Verticable in June 2018 and replaced it that same summer with an updated version.

Fortress now sues Digger for two counts of patent infringement under 35 U.S.C. § 271(a), alleging that the original version of the Westbury Verticable infringed on claims 1, 2, 5, 14, 15, and 20 of the '707 Patent and that the updated version of the Westbury Verticable infringed on claims 1, 2, 6, 8-11, and 13 of the '290 Patent. The parties have identified five disputed claim terms from the patents that need construction.

## II.  DISCUSSION

The United States Court of Appeals for the Federal Circuit has "exclusive jurisdiction of an appeal from a final decision of a district court of the United States . . . in any civil action arising under . . . any Act of Congress relating to patents . . . ." 28 U.S.C. § 1295(a)(1). Federal Circuit caselaw is therefore binding precedent because "Federal Circuit law applies to causes of action within the exclusive jurisdiction of the Federal Circuit." Golan v. Pingel Enter., Inc., 310 F.3d 1360, 1368 (Fed. Cir. 2002) (citing United States v. Hohri, 482 U.S. 64, 75–76 (1987)); accord Sample v. United States, 838 F. Supp. 373, 375 (N.D. Ill. 1993), aff'd, 65 F.3d 939 (Fed. Cir. 1995).

### A.  Applicable Law

"[P]atent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581–1582 (Fed. Cir. 1996). "The first step, claim construction, is a matter of law". Id. "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v.

AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotations omitted). Courts interpreting claims "look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576 at 1582.

"The words of the claims themselves . . . define the scope of the patented invention[,]" so courts first "look to the words of the claims . . . ." Id.; *accord,* Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[T]he claim construction inquiry . . . begins and ends in all cases with the actual words of the claim . . . ."). As a baseline, courts give claims the "ordinary and customary meaning . . . that the [words] would have to a person of ordinary skill in the art in question at the time of the invention . . . ." Phillips v. AWH Corp., 415 F.3d at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. But "in some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

If the ordinary and customary meaning isn't readily apparent from the claims, courts look to other sources in construing terms, including "the

remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. Intrinsic evidence—the claims, specification, and prosecution history—is given greater weight than extrinsic evidence. Id. at 1317. The specification "is the single best guide to the meaning of a disputed term[,]" Vitronics Corp. v. Conceptronic, Inc., 90 F.3d at 1582, but courts mustn't read limitations from the specification into the claims, SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001). "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips v. AWH Corp., 415 F.3d at 1319.

### B.   Terms 1 and 2: "open ends" and "secured within"

The first disputed term identified by the parties is "open ends" as found in Claims 1 and 15 of the '707 Patent. The second disputed claim term is "secured within" that's likewise found in Claims 1 and 15 of the '707 Patent but is also found in Claim 10 of the '290 Patent.

Claim 1 of the '707 Patent reads:

1. Apparatus, comprising:

a first rail member including a plurality of first openings spaced apart along a length of the first rail member;

a second rail member, comprising:

> an outer U-shaped channel defined by an outer web member and an opposed pair of outer leg members, the outer web

member defining a plurality of outer openings spaced apart along a length of the outer web member; and

an inner U-shaped channel defined by an inner web member and an opposed pair of inner leg members, the inner U-shaped channel mounted within the outer U-shaped channel with **open ends** of the inner and outer U-shaped channels facing each other, the inner web member having inner openings spaced apart along a length of the inner web member, each inner opening being aligned with a corresponding outer opening formed in the outer web member;

at least one vertical support member mounted to and extending between the first rail member and second rail member; and

a plurality of vertical cables mounted to and extending between the first rail member and second rail member, wherein a first end of each vertical cable is **secured within** one of the first openings and a second end of each vertical cable is **secured within** opposite aligned inner and outer openings of the second rail member.

The relevant language in Claim 15 of the '707 Patent is the same as Claim 1. The relevant language in Claim 10 of the '290 Patent is the same as Claim 1 of the '707 Patent.

### 1. Term 1: "open ends"

The parties agree that the court should give "open ends" its plain and ordinary meaning, but they disagree as to what that is. Fortress says that the plain and ordinary meaning of "open ends" requires no further construction because the term is easily understood in the context of the claims and specification. Fortress cites intrinsic evidence for support—Figure 3 from '707 Patent illustrates the arraignment described in Claims 1 and 15:



FIG. 3

The specification provides that "the first channel member 20 fit[s] within the second channel member 22 and the open ends of the two channel members oriented facing each other." ('707 Patent, 2:61-64). "Each channel member 20 and 22 is formed of a web member and an opposed pair of leg members extending generally perpendicularly from the web member. The space between the leg members defines the open end of the channel member." <u>Id.</u> at 3:4-8. The web member is the flat portion of the U-shaped channel member, and the leg members are the portions that run perpendicular to the web member but parallel to each other.

The specification also explains other arraignments that involve the open end of a channel member—for example, Figure 10:



FIG. 10

The specification provides: "the open end of the top rail 14 may be closed or covered using other means. For example, FIG. 10 illustrates the use of a wooden member 96 which can be secured to the top rail 14 . . . ." <u>Id.</u> at 5:42-45.

Blending the Merriam-Webster Dictionary's entries for "open" and "ends," Digger proposes that "open ends" means "uncovered edge or boundary." From there, Digger concludes that "open ends" means the outside edge of a channel member such that the open end of the inner channel member ((20) in Figure 3) abuts and faces the closed end of the outer channel member ((22) in Figure 3). Digger clarified at oral argument that this means the space at the top of the U-shaped channel, not the space between the leg members.

Fortress responds that Digger improperly asks the court to combine separate dictionary definitions to "open" and "ends" where the resulting construction is untethered to the description of the open ends of the channel members in the specification.

The court holds that "open ends" are commonly understood words the meaning of which (as understood by a person of ordinary skill in the art) is readily apparent from the claims. <u>Phillips v. AWH Corp.</u>, 415 F.3d at 1314. As such, no further construction is necessary. <u>Id.</u> Any attempt to change the words "open ends" runs the risk of changing the patent.

9

## 2.   Term 2: "secured within"

The parties next dispute the meaning of the phrase, "secured within." The reader will recall that Claim 1 of the '707 Patent reads in part:

> . . . a plurality of vertical cables mounted to and extending between the first rail member and second rail member, wherein a first end of each vertical cable is **secured within** one of the first openings and a second end of each vertical cable is **secured within** opposite aligned inner and outer openings of the second rail member.

The relevant language in Claim 15 of the '707 Patent is the same as Claim 1. The relevant language in Claim 10 of the '290 Patent is the same as Claim 1 of the '707 Patent.

As with the first disputed term, the parties agree that the court should give "secured within" its plain and ordinary meaning, but again they disagree as to what the plain and ordinary meaning is.

Fortress says that the plain and ordinary meaning of "secured within" requires no further construction because the term is easily understood in the context of the claims and the specification. The language in Claims 1 and 15 of the '707 Patent (which is identical) use the term "secured within" to describe the orientation of the openings in the web members with respect to the vertical cables. Fortress says that the language in Claim 10 of the '290 Patent describes that, when attached to the first and second rail members, one end of a vertical cable goes through an opening in a first rail member, and the other end of the same vertical cable goes through an opening in the second rail member.

Fortress says that the meaning of "secured within" in the specification is understood with reference to the figures and by the language describing the relationship between the openings and the ends of the vertical cables. Figure 2 from the '290 Patent is a view of a portion of the bottom rail 12 showing the first openings 12 in the inner U-shaped channel 20 and the second opening 28 in the outer U-shaped channel 22:



FIG. 2

The specification provides that "the first and second openings 26 and 28 are provided in connection with supporting the attachment of the first ends of the plurality of vertical cables 19 to the bottom rail 12 . . . ." ('290 Patent, 3:31-34). Figure 6D from the '290 Patent shows the relationship between these openings and an end of a vertical cable, and Figure 6C also shows this relationship, but with respect to the top rail:



FIG. 6C



FIG. 6D

Digger again cites the Merriam-Webster Dictionary (entries for "secured" and "within") to support their construction that "secured within" means "affixed inside of." Digger also says that Fortress doesn't offer an alternative meaning, and the court should construe "secured within" in accordance with their proposed construction to protect against future ambiguity. At oral argument, Digger clarified what its construction of "secured within" would mean. For example, the swage fitting at the end of a vertical cable is square, and so is the opening in the web member of the U-shaped channel that the end of the vertical cable occupies. According to Digger, "secured within" means that the swage fitting is secured in that opening.

Digger explains its preference for "affixed within" only defensively: it anticipates that as this litigation proceeds forward from claim construction, Fortress will argue that a cable is "secured within" if it simply passes through the opening.

Digger's argument reaches too far. The "secured within" phrase is part of a broader description. The claim describes a cable and its location—the cable is secured within oppositely aligned inner and outer openings of the two channel members. The portion of the claim the court is asked to construe makes no reference to the location of the shank that secures the cable, or to any other method or location by which the cable is secured with the channel members' opposite openings. The drawings and specifications might, as Digger contends, suggest that the apparatus securing the cable is also within the inner and outer

openings, but that isn't what the phrase under construction describes. The phrase is part of the description of the cable. The cable must be held securely so that it is held within the opposite openings. The claim says nothing more, and the court can't "construe" the claim to address the type or whereabouts of the securing device.

Digger's proposed construction would change the meaning of the phrase "secured within." Nothing that the parties have proposed, or anything else that comes to mind, amounts to improvement over the language in the claim. These are commonly understood words the meaning of which (as understood by a person of ordinary skill in the art) is readily apparent from the claims, and no further construction is necessary. Phillips v. AWH Corp., 415 F.3d at 1314.

### C.   Term 3: "Pre-Assembled"

The third disputed term is "pre-assembled" as found in Claim 14 of the '707 Patent and Claims 6 and 13 of the '290 Patent.

Claim 14 of the '707 Patent reads:

14. The apparatus of claim 1, wherein the first and second rail members, vertical member and plurality of cables are ***pre-assembled*** to form a barrier panel.

Claim 6 of the '290 Patent reads:

6. The barrier of claim 1 wherein the top and bottom rails, the rigid support member, the first vertical cable, and the second vertical cable are ***pre-assembled*** to form a barrier panel.

Claim 13 of the '290 Patent reads:

13. The vertical cable barrier of claim 10 wherein the first rail member, the second rail member, the at least one vertical support member, and the plurality of vertical cables are **_pre-assembled_** to form a barrier panel.

Fortress's proposed construction is "assembled before delivery to a job site." Digger proposes that the term be given the ordinary meaning from the Merriam-Webster Dictionary of "having been assembled in advance." Digger's construction is broader—the panels could also be "pre-assembled" at the job site.

Fortress cites the claim language and the specification for support. Fortress says the claims give context to the meaning of "pre-assembled" by claiming a pre-assembled panel formed of at least five separate components. Fortress then says that the specification discusses panels that can be erected between posts and cut to a desired length at a job site. Fortress also says that the specification explicitly states that a "panel may be pre-assembled before delivery to a job site." ('290 Patent, 1:38-39). But Digger points out that simply citing that language adds temporal (before delivery) and geographical (any place other than a job site) limitations to the claims, and courts can't read limitations from the specification into the claims. SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d at 1340. And at any rate, the specification language say that a panel *may* be pre-assembled before delivery to a job site, not that it must be.

Fortress says Digger's proposed construction is weak because it's only supported by an extrinsic dictionary definition, whereas intrinsic evidence supports Fortress's construction.

The claims being construed offer no basis to read a geographic limitation as to where the described items are to be assembled. The word "pre-assembled" requires that the barrier panel be assembled before being joined with other components, but says nothing about where the assembly must occur. Nothing in the claims or specifications suggest that the barriers must be assembled somewhere other than the fence's eventual location. It might make sense to assemble the barriers before delivery to the job site; it might be economical to assemble them somewhere other than the job site. But nothing in the patent prescribes that the barriers be assembled remotely or before delivery.

Fortress makes an argument based on claim differentiation. Dependent claims are claims that add further limitations to a broader claim that they reference (the broader claim is called an "independent claim"). "'[C]laim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006). "[R]eading an additional limitation from a dependent claim into an independent claim would not only make that additional limitation superfluous, it might render the dependent claim invalid." Id. Courts favor claim constructions that maintain claim validity over constructions that would render a claim invalid, though

courts should first apply all other available claim construction tools to resolve claim ambiguity. Phillips v. AWH Corp., 415 F.3d at 1327.

Fortress argues that Claim 1 inherently covers an assembled rail barrier (as opposed to a collection of unassembled parts) whether it's assembled in place at a job site or manufactured offsite and delivered to the job site as a pre-assembled panel. As Fortress sees it, Claim 6's[1] "pre-assembled" verbiage should be construed more narrowly to cover a panel that's manufactured offsite and delivered to the job site as a pre-assembled panel so that the claims are differentiated and maintain validity. In this way, the specification clarifies Claim 6's language when it explicitly states that a "panel may be pre-assembled before delivery to a job site." ('290 Patent, 1:38-39). And Digger's proposed construction should be rejected, Fortress says, because it eliminates a distinction between Claims 1 and 6.

Patent law requires that the specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). The primary purpose of the requirement that one's invention be distinctly claimed is "to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights." Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996)

---

[1] Fortress makes this argument with reference to only Claim 6, not Claims 13 or 14. But the argument applies to those claims too.

(quoting <u>General Electric Co. v. Wabash Appliance Corp.</u>, 304 U.S. 364, 369 (1938)). "Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning." <u>Id.</u> So "if the two proposed constructions before us presented an 'equal choice' . . . the narrower construction would be more appropriate." <u>Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.</u>, 743 F.3d 1359, 1365 (Fed. Cir. 2014).

Digger responds that the issue isn't claim differentiation but claim indefiniteness. Apparatus claims describe an invention by reference to its structural components, while method claims protect the process of making a product. Digger points out that Claim 1 describes the components of the V-Series barrier but says nothing about how or where the barrier is assembled. "Courts must generally take care to avoid reading process limitations into an apparatus claim." <u>Baldwin Graphic Sys., Inc. v. Siebert, Inc.</u>, 512 F.3d 1338, 1344 (Fed. Cir. 2008). So, Claim 1 doesn't say anything about how (or when or where) the barrier is assembled, and Fortress can't impute a more narrow construction of "pre-assembled" into Claim 6 by differentiating it from Claim 1.

The claims the court construes today don't support the claim differentiation presumption. The only apparent difference between Claims 1 (both patents), 14 ('707 patent), 6 ('290 patent), and 13 ('290 patent) appear to be reference to a vertical support member in Claim 13. The three dependent

claims seem to specify what must be done before the Claim 1 apparatus exists; they are silent as to where it must be done. Insofar as the quest to discern the meaning of "pre-assembled," claim differentiation provides no help.

Fortress's proposed construction would change the meaning of the claims at issue by importing a geographical requirement without support in this record. Digger's proposed construction, while broader than Fortress's, is consistent with the claims, the specifications and the drawings. The court adopts Digger's construction of "pre-assembled": "having been assembled in advance."

### D.   Terms 4 and 5: extending beyond and concealed by

The fourth and fifth disputed terms use different language but describe the same concept. The fourth term is "each one of the pair of bottom leg portions extending beyond and concealing the adjustable end members" as found in Claim 1 of the '290 Patent. That claim reads in relevant part:

> 1. A barrier, comprising:
>
> > . . .
> >
> > a bottom rail comprising a bottom web portion and a pair of bottom leg portions . . .
> >
> > wherein the first and second bottom swage fittings are each coupled to a respective adjustable end member, ***each one of the pair of bottom leg portions extending beyond and concealing the adjustable end members*** therebetween, wherein adjusting the adjustable end member adjusts a tension in the respective first and second vertical cables.

Fortress's proposed construction for Claim 1 is "The bottom of each one of the pair of bottom leg portions is below the tops of the adjustable end members

and obscures observation of the adjustable end members after installation." Digger proposes "extending beyond" be given the ordinary meaning "to continue or stretch past" and "concealed" be given the ordinary meaning "to place out of sight," as found in the Merriam-Webster Dictionary.

The fifth disputed term is "each of the pair of opposed leg members extending beyond the female threaded members such that the female threaded members are concealed by . . . the opposed pair of leg members . . ." as found in Claim 10 of the '290 Patent. That claim reads in relevant part:

> 10. A vertical cable barrier, comprising:
>
> . . .
>
> a second rail member, comprising a U-shaped channel defined by a web member and an opposed pair of leg members, the web member defining a plurality of second openings spaced apart along a length of the web member; and
>
> . . .
>
> a swage fitting including a hollow tubular shank receiving and directly attached to the second end of each vertical cable, each swage fitting coupled to a female threaded member larger in size than the second openings and ***each of the pair of opposed leg members extending beyond the female threaded members such that the female threaded members are concealed by*** and disposed between ***the opposed pair of leg members***, each female threaded member adjusting a tension in the respective vertical cable.

Fortress's proposed construction for Claim 10 is almost identical to is proposed construction for Claim 1: "The bottom of each one of the pair of opposed leg members is below the tops of the female threaded members and obscures observation of the female threaded members after installation." Digger proposes the same construction it proposed for Claim 1.

19

Digger provides a reproduction of Figure 6B (shown below) of what it thinks Fortress's proposed construction looks like.



Digger's diagram of its proposed construction matches Figure 6B in the patents. Digger then points to the claim language, specification, and prosecution history to show that Fortress's proposed construction is inappropriate because the construction leaves the nut unconcealed.

Fortress has a different version of what its proposed construction would include, shown below:



Fortress says that the claims only require the leg members to extend beyond the "top" of the end member (the nut) so as to obscure the end member from sight

after installation, but not necessarily any farther. Fortress also cites the claim language, specification, and prosecution history to support its construction. Fortress says that Digger's construction is too narrow because it would exclude its version of Figure 6B from being covered by Claim 6, and it would require the leg members to conceal the nut regardless of the orientation it's viewed at. For example, Digger's construction would require the leg members to conceal the end member even if the arraignment in Figure 6B was laid on its side, unlike its orientation after installation.

The intrinsic evidence compels a construction that the leg members must extend beyond the end member so as to conceal the end member[2] from sight. The claim language contains commonly understood words the meaning of which (as understood by a person of ordinary skill in the art) is readily apparent from the claims. <u>Phillips v. AWH Corp.</u>, 415 F.3d at 1314. The intrinsic evidence doesn't support any further limitations about how far past the leg members should extend past the end member.

### III.   Conclusion

For the foregoing reasons, the term "pre-assembled," as used in Claim 14 of the '707 Patent and Claims 6 and 13 of the '290 Patent, is construed to mean, "having been assembled in advance." The words used in each of the other

---

[2] Or "female threaded member" instead of "end member," as the language is used in Claim 10.

challenged phrases shall have their ordinary meaning without further construction.

SO ORDERED.

ENTERED: <u>August 8, 2022</u>

   /s/Robert L. Miller, Jr.
Judge, United States District Court